Larry Dragna and Trish Dragna v. KLLM Transport Services, Mr. Percy. Good afternoon. May it please the Court, Matthew Percy on behalf of Larry Dragna, Trish Dragna, and their minor child, A.D. We are presently before this Court on the granting of a motion for summary judgment in favor of KLLM on three distinct causes of action. Vicarious liability, joint venture, and negligent hiring. The central issue before this Court is whether the District Court properly applied the summary judgment standard to the plaintiff's three causes of action in dismissing all the plaintiff's claims. The law is very clear that the judge should not weigh evidence judge credibility of witnesses nor make any inference regarding any of the facts of the case, which is exactly what the District Judge improperly did in this case. We argue that in this case the District Court impermissibly made credibility determinations and improperly weighed evidence in connection with each of the three causes of action. All reasonable factual inferences should have been resolved in favor of the plaintiffs in this matter. They were not. I will begin with the plaintiff's first cause of action, negligent hiring. The determination of whether A & Z Transportation, who was the motor carrier who actually got in the accident in this case, whether they were an independent contractor and its relationship with KLLM is a question of fact in itself and should have been left to a jury in a trial in this matter. Nevertheless, even if that was the case, Louisiana courts have established that a party may be independently negligent in the selection of an independent contractor if the party knew or should have known that the independent contractor was unfit. In the case at hand, KLLM had direct knowledge that A & Z was unfit when it selected A & Z for the November 2, 2011, transport. Do we need to have a contract here before the parties? And is there a contract between these two parties? And does it matter that we're talking about KLLM looking like they're two different companies? I'm going to actually address that as I move through negligent hiring and joint venture. KLLM holds two authorities. They are a motor carrier who operates its own truck, and they're also a logistics broker that arranges for transportation with other motor carriers. There is quite a decent amount of blurring the lines here, which actually goes into our cause of action and why we think there were questions of fact, specifically in regard to the joint venture cause of action. So if I may continue, okay. There's a ton of public information available regarding the safety record and fitness of all motor carriers. One can simply search the FMCSA website and enter a motor carrier's motor carrier number, and the information can be instantly accessed. I can access it. You can access it. Anybody can. In addition to the easily accessed information, KLLM actually paid a service called Carrier 411 to pull this public information and put it in an easy-to-use format for its employees to be considered whenever they selected a motor carrier to move loads. Evidence in the form of a Carrier 411 log sheet, which was presented to the judge, showed every time that KLLM looked at ANZ's carrier safety information, and it establishes what KLLM saw in regard to ANZ, which included its abysmal safety record and included previous wrecks and multiple basic scores above their respective thresholds. One of our main concerns is that the judge somehow came to the conclusion on her own that basic scores are an unreliable indicator of future crashes. Multiple studies undertaken by the federal government itself, as well as some other studies cited by the defendants, clearly established that the reliability of basic scores are preventing future wrecks in regard to motor carriers. What is the evidence in the record of what KLLM would have known of that at the time, November 2011? I'm glad I made you happy. I guess you have an answer. I'm on my way, okay? If you indulge me, I'm going to work my way and it's the next thing on my list. I'm going to go through each item that they would have known about, if you'd allow. But the studies I'm specifically asking about that the parties seem to be talking about a good amount, a trial in the district court, would those have been in front of the KLLM? They were presented, attached to both of our cross motions for assembly. Would KLLM have known about those when the decision was being made? Some were after the fact, which a lot of these studies were in hindsight. What they would have known was that CSA 2010 was implemented, which made publicly available on-road information. There is something called a compliance review, which generates a safety score. It could be satisfactory, unsatisfactory, conditional, or unrated. In this case, at all pertinent times prior to the accident, ANZ was an unrated motor carrier. So the question is, what information was available? If they're not rated, well, basic scores had gone into effect in 2010, and that information was available, and there were seven categories. The most notable one would be unsafe driver. What's important to me, it seems, is what would KLLM have known? What was the industry understanding, and specifically at KLLM, on the importance of the basic scores in November 2011? Okay. One thing I'll just point out is that the defendant's own experts agree with our expert that the unsafe driving score was the most reliable indicator at that time of predicting future crashes. What they would have known is that these basic scores were available, that their motor carrier, in this case ANZ, was unrated, and that they could see how many wrecks that this company had been in prior to hiring them and other pertinent safety information in making an informed decision or what should have been an informed decision in selecting this carrier to send it across state lines. All right. I'm listening a lot slower than you're talking. I'm sorry. I apologize. I'm trying to catch up. The unrated just means that the Department of Transportation had not yet conducted an audit to give a rating, right? Yes, sir. So that's the one thing that KLLM had in front of it at the time it made the decision to hire. It's one of the things that it had in front of it. All right. Well, I'm going to go through my list. So they had that unrated, nothing to go by. It just means the Department of Transportation didn't get to them yet. Then they had something from the, and I've got to read it, the Federal Motor Carrier Safety Administration. That's who did the scoring, right? I mean, in categories you can go from 0 to 100 in these different categories. Yes, sir. And KLLM had these scores in these different categories. Yes, sir. And the scores were bad. Yes, sir. If 0 to 100, they had scores in the 80s and 90s, at least in three of these what I would deem important categories. Absolutely. All right. And so your argument seems to be that the judge said, recognizing what the scores are, my real question is how these scores can be used to accurately predict what will happen in the future. And so there's an expert that says these scores are pretty accurately interpreted. Both experts agree. Both say that. Well, that goes to a place that I've, before I get there, here's where I want to go. Don't these numbers, this 83.9 in unsafe driving, 82.1 in fatigue driving, 94.8 in vehicle maintenance, what are they based on? Isn't that based on a history? It's based on on-road performance. When you see the 18-wheelers and you see pull over into this lane, go to this weigh station, it's based on receiving traffic tickets if they were in an accident, all sorts of information that's continually fed through the system and updated on a monthly basis so you get a score and it rises or falls based on their on-road performance. So here's where I am. Irrespective of being an accurate predictor of the future, that number indicates that this is a history. This says this is what they've done or not to earn or merit this score. We know at least it does that. Yes, sir. All right. Okay. I'll move forward. And what I wanted to do was the pertinent question is, and it's central to this case, is what information was publicly available to KLLM regarding ANZ, who was the motor carrier prior November 2, 2011, the date of the wreck? Okay. At all times prior to the accident, ANZ was unrated. So let's go to the public information. February 4, 2011, ANZ got into a wreck in Alabama. March 10, 2011, ANZ hired, I'm sorry, KLM hired ANZ for the very first time, checked Carrier 411, saw that they had a couple of scores above the basics, and just moved on, didn't dig deeper, even though the report told them to, and selected them. April 7, 2011, ANZ failed a new entrance safety audit, which is a kind of a, here's a preliminary. We give you your authority, but we're going to do an early safety audit. They actually failed it. Okay. June 3, 2011, KLM hired ANZ again for another transport service, didn't even check them on Carrier 411, which was their own rule. They were to check Carrier 411 each time to check these scores to see if they needed to dig a little deeper. That was what the employees were supposed to do. They didn't even check them. They just hired them that time. July 22, 2011, ANZ now has three basics. You say that's what they were supposed to do. It was their own custom. It was custom in the industry to check basics. It was their own policy, internal policy, to check Carrier 411 to see what the basics were and what their actual safety rating was. And then if they got a negative number, was it their internal policy to do some follow-up in connection with the discovery of a negative number? There was, ANZ. Based on witness testimony, if there were two scores, they decided just arbitrarily that, yeah, you could hire them, no matter what the scores were. If it was three scores, they were supposed to dig a little deeper, call the motor carrier, find out why their scores were this high. There's no evidence of record in regard to the November 2nd. So let me, you know I'm listening slowly. Yes, sir. So in accordance with their own policy, what would these scores have indicated that their next step should be? Their next step should have been that they should have called ANZ. They should have asked them, why are your scores high? Find out why their unsafe driving score was so high. That's actually disregarding the fact, move away from the scores, that there was a record of two accidents. One occurred five days before they hired them on November 2nd. They were in another accident in another state. They should have known. They're now looking at a motor carrier. Should have known what? That they were in two accidents before they hired them on the November 2nd date when they got in an accident again on KLOM's watch. Okay? Now, moving from there, KLOM's big argument that they keep going back to is that in March of 2012, four months after the accident, ANZ received a satisfactory rating stemming from a compliance review. So four months after the November 2nd accident, they get a satisfactory rating. Both experts tend to agree that the compliance review and that safety rating isn't really indicative of predicting future crashes because it's a static assessment. They come to the motor carrier. They review their files. They say, do you have adequate safety measures in place? Okay, if they find yes, it doesn't mean they're operating safely, and I'm going to prove that right now with what became publicly available after that. Yes, sir. Slow down for me, too. What is the significance of that safety rating? It seems to me that they would have had all the information you're talking about that a few months earlier KLM would have had, correct? Correct. And yet it's one thing to say it's a snapshot of current status or something like that, but it doesn't take into account. The thing is you're asking the court to say that you have presented enough to have shown that KLM should have been on alert of problems, sufficient problems with ANZ to do something more than what they did. But somebody else of greater stature than the Fifth Circuit perhaps on issues of highway safety looked at that same information and did not seem concerned. Is that not the relevance of that rating that they got a few months after the? The rating itself has been called into question by the FMCSA. CSA 2010 is moving to update the actual compliance review itself. They recognize themselves that it's flawed because this is legislation. I mean, they've got to do this under the, you know, Congress has to do this. They're moving toward phasing out compliance reviews or making them more, I guess, realistic in assessing a carrier's real performance. And the FMCSA has these basic scores which eventually, in this case, actually tend to trigger a compliance review. But when you look at the public record and ANZ's compliance review after the fact, there was no evidence of any wrecks that were considered. So now they've got their satisfactory safety score, which KALM says that proves we were reasonable. Well, here's what happened while they had their safety score. April 11th, one month later, 2012, they got in another wreck in Pennsylvania. June 27th, ANZ, 2012, got into another wreck in Arkansas. That's wreck number five if you're counting. Does KALM know that in November of 2012? Here's the interesting thing. KALM, who says they have a reasonable policy for selecting, hired ANZ again on July 9th, 2012, knowing that they had already been in a wreck on their watch on November 2nd and didn't even check carrier 401 to see how their scores had progressed or if they had been in any other wrecks. Had they done that, they would see they had already been in five more wrecks, but they hired them. But they're saying, oh, we're completely reasonable in how we select our motor carriers. It's just not the case. Now, I've got a whole other cause of action that I've got an even more complicated set of facts. You've got 30 seconds, counsel. Okay. And you talk fast. I know. I'm trying to put it in. 30 seconds. Normal person, that would be five minutes. I know, right? Another possibility is to rely on your brief rather than use the 20 seconds. What's that? Another possibility is to rely on your brief rather than. . . For joint venture, I will rely on my brief. I don't waive any of my arguments regarding vicarious liability, and if they bring it up in their rebuttal, I believe I have five minutes for rebuttal. So thank you all very much. I appreciate it. May it please the Court. Good morning, Your Honors. John Davis. I also want to recognize Katie Sicardo and Robert Blankenship. They have assisted. . . Sicardo doesn't want to argue here. We've had five cases. Everyone has been manned. There are three men on the Court. There's a male bailiff, Ms. Englehart, just all by herself up here. You want to take over or are you going to let him do it? You don't really know how funny that is because I was explaining to her that a stomach bug is running through my family, my wife. Now it's with me. I had this fear that I was going to have to call Katie and Robert and say, you're up, that I cannot stand up here. So I apologize. Oh, we're. . . The Court's having the same issue, so go ahead. Okay, so no shaking hands. I'll fist bump. So I'm not going to talk about the vicarious liability or joint venture. I'm going to just leave those to the briefs. I think the main issue is exactly what Your Honor was discussing, and that is the negligent hiring. I think that this becomes a very streamlined, and I hate to say easy, so I'm not going to say it, but a more streamlined analysis when you use the correct standard under Louisiana law for this particular cause of action, negligent hiring. And the judge got it right. So what she said, and this is on her decision, Record 2477, negligent hiring. In determining whether a principal is negligent for hiring an irresponsible independent contractor, the court must consider the principal's knowledge at the time of the hiring. More specifically, where the principal has previously hired the contractor with good results and there is no evidence in the record to demonstrate the principal's prior negligent hiring practices, a claim for negligent hiring fails. So now let's look at the evidence. It is undisputed in the record that ANZ had successfully performed transportation services for two loads brokered by KLLM, March 2011 and June 2011. So for two loads, the history is good result. No problems, no negative history, no adverse history. When they look at the information that's on Carrier 411, which gives them some information about the carrier, it says they have more than enough insurance, that their Department of Transportation Motor Carrier Authority is valid and up to date, they can interact in interstate transportation, that there is no alert frauds or negative history on there. So what are we left with? We're left with the basic scores, and I'd like to come back and talk with you about that. The judge said something about knowledge. Is that the standard? Is it knowledge, is it known or should have known? It's a negligent standard. So is knowledge required or the possibility of going beyond just knowledge and should have known also part of the . . . I don't believe should have known is part of this analysis under Louisiana law. Now, if I went to Maryland law under the Schramm case, they have a different state law analysis in that case, a duty risk analysis. If I went to New Mexico, they're going to have a different analysis. But under Louisiana law, Judge Shelley Dick got it right. She quoted the district courts that talk about this very narrow cause of action. There aren't a lot of cases about this where you can negligently hire an independent contractor who causes damage to somebody else. That's why they leave it very narrow. What is your experience? What is your experience with this independent contractor? How have you responded to what's been brought up on one of the cases that hold that? Guillory is one of the cases that say only looks at principles, actual knowledge, and negligent hiring. But Guillory cited a case, Hemphill, that actually said knowledge or should have known. It seems to me within these precedents, there's a fair amount of counterindication to what you're saying. I'm not sure this case turns on should have known. But it sounds to me as if we sitting in diversity, Judge Dick trying to figure out what to make of this, we have to as well. There's maybe as much authority saying should have known as part of the element, as part of the analysis, as what you're saying. Well, let's just assume that it is. Let's just assume that. It might be good because if you can win on that basis, you can win on a more limited. So give it to us. And I'm going to go with the belief that we can win on that basis. So what did we know and what should we have known, correct? Let's go. What did we know? We know that they had a very good experience with us, that there were no problems. There was never a problem. So that's our experience. The other thing that we knew is that they didn't have a rating. And we know that there are companies that are on the road for 20 years that don't have ratings. And we know that the Department of Transportation and both experts agreed that you can be on the road with no problems as an unrated carrier. That's not a disqualifier. What did we know? We also knew that they had basic scores. But what does that tell us? What should we have known from that? The basic scores, which weren't discussed when you all were talking earlier, have a specific disclaimer that their expert acknowledged exists. And it exists even though there's this research out there that might conclude one thing about what the basic scores mean or might conclude another thing what the basic scores mean. But there is a specific disclaimer that says don't rely upon this to make a determination on the safety fitness of a motor carrier because it could lead to unintentional or just plain wrong consequences. Is there any testimony, any evidence as to what is the basis of that disclaimer? I mean, the basic scores are supposed to be showing something about safety and maintenance and whatever the other categories are. Why the disclaimer? What's the underlying? I mean, I'm concerned there may be a fact issue what to make of the disclaimer. So is there any understanding as to why, despite the basic scores are based in part on actual events, I suppose, why is that disclaimer accurate? The disclaimer is informing people, KLLM, general citizens, don't use this to determine the safety of a motor carrier. It is specifically used for, and I'll use their exact words. Let's see if I can find the exact. Okay. It says that this data is not a safety fitness determination and that the use of this data for purposes other than those identified, and what's identified, identified to prioritize investigations and roadside inspections by the DOT because it may produce unintended results and inaccurate conclusions. So this statistical data is simply to be used by the DOT to identify who needs to have roadside inspections. That's it. It's not to be used by the general public to determine whether or not an entity is safe. In fact, the Federal Motor Carrier went on record, Federal Motor Carrier Safety Administration, Darren Jones, a field administrator for the FMCSA, this is record 1384. He was specifically asked the question and specifically answered that it was improper for the agency to rely upon the statistical data, the percentile scores, to make a determination as to the safety fitness of a motor carrier. Well, does KLLM have a policy that says you do some further inquiry or investigation based on, at least in part, what these scores reveal? Yes, and here's what it is. So why would you adopt a policy if the scores are so unreliable? Right. Well, this is exactly what we do, which was a bit mischaracterized, and it's more accurately stated in the testimony from Chris Estes. I'll look for the page record. This is the policy. The policy is there is no instruction from the DOT on how to use this information, and in 2010, right before this accident, this was brand-new information. So there's no instruction from the DOT how to interpret these statistics. So KLLM says let's just use a common sense, reasonable, prudent person approach. You have five categories, and the DOT is not saying which one is more or less important back then, okay? So let's say if you have one or two of these categories that are above the threshold, that's okay. But if you have four or five, you're on the backside of that bell curve. That's not okay. But if you have three, let's talk internally to find out if we have any history with this carrier that is adverse or negative. And if we do, we're not going to use them. But if we don't, as in this case, there was no problem, we're going to continue to use them because they're authorized by the DOT to engage in interstate transportation. They have more than the required insurance. We have no history, the knowledge, we have no history of them having a problem with us. In addition, there is no explanation in this information that's available because it's confidential. Who's at fault for these accidents? So if you see an accident and the motor carrier is rear-ended and it's not their fault, it shows up. And that's what those studies that came out after this was rolled out say. They say, you know what, you can't use that information to determine somebody's propensity to get into accidents or their unsafe, I'm drawing a blank on the word, their propensity to get into an accident. You cannot use this statistical data to predict that. And, in fact, some of these studies said that the smaller the carrier, the more out of proportion the percentages are. Therefore, you have a disclaimer, and it says don't rely upon this information. Is there evidence that KLLM Logistics have followed their internal procedures? Say that one more time. Is there any evidence that those procedures were followed? How many? Weren't there three scores above the threshold? There were, yes. So that would, under the procedure, said that there should have been some internal discussion. Is there any evidence that that occurred? Yes. Cassie Iacomino was asked that question as well as some of the others, and she's in charge of the brokerage. And she said, you know, I cannot recall specifically the conversation, but the 411 information shows that we checked them out again. It shows a printout of when that information was checked. But they can't recall that. There was no recollection of that. So I can't say that we have an affirmative. But there is no other evidence that there was a problem. Is failing to follow company procedures an element under Louisiana law for negligent hiring? No, it is not. It's not part of that. Now, and I would suggest that they haven't failed to follow it. There's no evidence that they failed to follow it. In fact, all of the testimony confirms that they followed their normal operating procedures, including the first intake and then on the date of this particular accident, that they checked 411. They confirmed the accuracy of the information there. Well, we are on summary judgment. There was evidence of post-accident activities. I'm wondering if there would have been relevant evidence on Louisiana law later to show whether KLLM generally did not follow their internal procedures. Well, I will say there is absolutely no evidence that KLLM did not follow its procedures at the time of this accident and the initial intake. And according to the Louisiana law, there is no evidence, and I'll go back to the judge's decision, the record is devoid of any evidence demonstrating that KLLM Logistics had a history of hiring irresponsible contract motor carriers. What were you just reading from? That was... Not the page, but was that something from the district judges? This is from the district judge, right. She looked at the evidence that was presented, and there is absolutely no evidence. Under Louisiana law, the standard that we're following, there's no evidence that KLLM has a history of hiring irresponsible motor carriers. There was no discovery taken on that. There's no information about any other motor carrier that might have been considered irresponsible. The only evidence that is in front of us is that KLLM had two satisfactory experiences with this motor carrier. They were duly qualified to be on the road. They had more than enough insurance. There was no adverse history. And what Matthew said correctly is after the fact... Would they be authorized to unlicense, delicense, stop A&Z from operating if they found high numbers in five categories? Or does that authority come from the Department of Transportation solely? FMCSA is within the DOT, so it's one and the same. It's just that's the particular arm. So what would happen is if the DOT, FMCSA, became concerned about a motor carrier, they would conduct a safety audit. And more likely than not, that occurs after an accident, just like in this case. And in that, as the defense expert testified to, this is what goes on. And by the way, he was a regulator with the DOT. He was a regulator with the DOT. His whole job was to evaluate motor carriers. He would go in, he would look at their practices and procedures, and he would also determine what is their crash history, had access to exactly what was that accident, who was at fault for that accident. I'm talking about Lane Van Ingen. He is the defense expert, and his history is laid out in the briefing. So his whole job while with the DOT was to audit motor carriers. He would go in, and he explained the entire process. Following an accident, you have access to that motor carrier's accident history. You know how that accident happened. He said they would have had access to this accident. They would know the details of it. They would have access to the practices, the policies, and procedures of that motor carrier. So in this instance, after this event occurs, DOT conducts this safety audit. They have access to more information than KLLM or the general public has access to, and they conclude after this accident, looking at the practices and procedures, they say, A and Z, you have a satisfactory safety rating. So what if that occurred? What if they had the satisfactory safety rating before instead of being unrated? Nothing's changed other than they have a satisfactory safety rating from the DOT. Before the accident, they were unrated. So nothing's changed. The only thing that we're affirmed here is that the DOT, the regulatory body, the only body that can determine the safety fitness of a motor carrier, said you have a satisfactory safety rating. Who better to get that approval from? It says what we did was reasonable. If we didn't do it reasonably and if there was a problem with all of the information and details, the DOT would have done its job and said conditional, or as you suggested, pull that DOT permit. They didn't do that. They said you're satisfactory. I don't know what more KLLM could have done to predict because clearly the DOT says don't use this statistical data to predict the safety fitness or crash, I keep wanting to say crash worthiness, but the propensity to get into crashes. It said don't use it for that purpose. So all you can do is say, okay, our history, like Louisiana law says, our history has been good. What more do we need to know? Our history has been good. They've not had a problem. But the judge didn't weigh that. She didn't say, well, is it good or bad? She said the only evidence in front of me is that they had two trips, and both of those trips were fine. That's all that was in front of her. She didn't have to weigh or assess credibility of anybody. That was the only thing in front of her. And according to the law that she relied upon, the other part was there was no evidence that KLLM had a history of hiring irresponsible motor carriers.  And in the other instance, there were two positive experiences, no problems. There was no way to predict whether this person was going to take a left turn or not. KLLM didn't have responsibility or ownership over how that person operated the vehicle. That was for A and Z. So there was no assessment of the weight of the evidence. There was an assessment of sufficiency. There's been no effort in this case by KLLM to question that A and Z was at fault in the accident we're talking about? No, I don't think that it was questioned at all. I think it was an easy accident. The fellow made an unprotected left turn into oncoming traffic. So, Your Honors, focusing on the negligent hiring, the judge applied Louisiana law. She simply checked whether there was evidence or whether there wasn't evidence. In applying the Louisiana law, the only evidence that was presented said that KLLM and A and Z had two satisfactory trips before this, and there was no fraud or there was no negative history. There was no insurance issue. There was nothing in front of them that would present a problem that would say they could have predicted this accident and prevented it. And they had the stamp of approval from the DOT after this accident, saying this was a satisfactory safety-rated motor carrier. Thank you, Your Honors. Mr. Percy? In regard to the satisfactory rating, I've already addressed that, again, it's a static assessment. They're showing up, they're looking at files. They're not looking at actual safety performance. They're just saying you have certain safeguards in place that could make you safe. It doesn't mean you are safe. And based on the history I read to you about the multiple wrecks after the fact, they obviously weren't safe, and their basic scores, this is an interesting note, A and Z's above-threshold basic scores, most notably in unsafe driving, in this case, correctly predicted six crashes in a one-and-a-half-year period of A and Z's existence, most notably the two wrecks prior to the accident in question, the accident itself. Then on top of that, A and Z's basic scores correctly predicted three more A and Z wrecks, all while A and Z had a satisfactory safety rating. So to say that that's the stamp of approval is misguided. The other thing is Mr. Davis just talked about Cassie Aikamena and her testimony in regard to what she knew about the accident. Ms. Aikamena's deposition testimony, which was cited extensively to the district court, she pretty much says she doesn't remember anything about this. She actually didn't even know if she was the one who actually sent the rate confirmation to A and Z. She thought it was Nicole Cambius. It turns out it was Cassie herself, and she had no idea. So for them to say that, you know, what they did or didn't do, there's no evidence that they did anything in regard to what they saw on A and Z prior to selecting them that day. Another thing to note, evidence shows that as of August 13, 2014, a full two years after A and Z Transportation had lost all operating authority, as in they are not allowed to be on the road, KLLM's own system had not been updated. It still showed A and Z as having operating authority with no information regarding the previous performance, as in the wreck that they directly knew about on November 2nd. There's no mention of that wreck. In essence, according to KLLM's system, A and Z, we have no previous problems with them. We can use them again. They didn't even have operating authority at that point. Okay. The standard in regard to knew or should have known, I've extensively cited cases where the standard does include should have known, and it should include that because it's a negligence action and it's a question of fact. Not only should they have known, they did know because the evidence shows that they looked at Carrier 411 on November 1st, 2011. They knew the day before. They knew that they were in two previous wrecks. They knew their basic scores were three above the threshold, most notably unsafe driving, and they still selected them, and A and Z got in another wreck on November 2nd. Now, in regard to his expert, I've extensively cited our expert, who is a direct contradictor to everything Van Ingen says, except for they both agree, both experts, their expert also agrees that compliance reviews aren't reliable and that the unsafe driving basic score was always the most reliable predictor of future crashes. I don't know how you get around that. Their own expert said that. And the July 9th, 2012, after they had used A and Z three times, one of the three times A and Z got in a wreck on KLM's watch, July 9th, they use A and Z again and don't review a single shred of evidence. So all they knew was that A and Z was in a wreck, but it wasn't even in their system that he was in a wreck, so how can they say we've had good results? There's no evidence to suggest what results they had with A and Z, except for sure that they got in a wreck on November 2nd, and they should have at least dug deeper and asked the right questions in determining whether they should have selected that motor carrier. They did not. Ultimately, what this comes down to is you've got a case where you have a company from Mississippi, KLLM, sending a company from Tennessee in A and Z on the railways of Louisiana without any regard for or consideration of A and Z's history of accidents, the information that shows the potential for accidents, and their poor safety performance, and they take no action. They just send them to Louisiana, and guess what happens? We're here today because of the accident that occurred. Thank you very much. Thank you. Thank you, counsel. Court will be in recess until 9 o'clock tomorrow morning.